We'll now turn to the next case on the calendar. That is United States v. Cammarano. Let me make sure counsel is here. Mr. Levitt? Yes, I'm here, your honor. And you can see and hear us all right? Wonderful. Good. And Mr. Fiddleman? Good morning, your honor. Good. And you can see and hear all right also? Yes, thank you. Good. All right. So, Mr. Levitt, you have reserved two minutes for rebuttal. So that means eight minutes out of the gate. The floor is yours. Thank you, Judge. So this morning, I will focus primarily on two issues. First, the expert testimony of John Carrillo, which is discussed in point one of our brief. And secondly, the court's exclusion of impeachment evidence that government witness John Panisi knocked his girlfriend's teeth out after learning that Mr. Castelli supposedly had had been dating her. Time permitting, I also want to touch briefly on the very important issue concerning the sufficiency of evidence with regard to the male fraud conviction regarding Mr. Castelli's alleged no-show job. This court, your honor, has repeatedly told the government what it can and cannot do in the context of expert testimony. It's perfectly acceptable to introduce evidence concerning structure of organized crime groups or jargon that's used that the average juror may not understand or describing membership rules and the like. What's not fair, the enterprise typically commits the very crimes that the defendant is alleged to have committed on behalf of the enterprise. It's not fair game for the expert to bolster the fact testimony of the government's lay witnesses and the government's theory of on hearsay that's gleaned from debriefing cooperating witnesses in violation of the confrontation clause. And it's not fair game for the government to argue in summation that the expert's testimony corroborates the testimony of its non-expert witnesses. Well, there's a lot there. I guess I want to ask a question about one of the first things that isn't fair game. Is it your view that an expert can't say that the Gambino crime family engages in loan sharking, extortion, illegal gambling activities, and prostitution? That's not fair game? I don't think it's fair game when what the government does is when asked whether or how made members make money, the expert rattles off, not at all coincidentally, the specific crimes that Mr. Castelli was charged with committing. Gambling, which he said was the backbone of organized crime, extortion, and no-show jobs. I don't think that the jury requires an expert to tell it that perhaps organized crime members may be engaging in these activities. Let me interrupt you, sorry. An expert on the Cali cartel, it's not fair game to say they transport multi-ton quantities of cocaine and smaller quantities of heroin. That would be not proper? Well, first, I don't think it would be proper, and in such a case, I am certain that the government would have numerous witnesses, lay witnesses, fact witnesses who would say that. I don't think that a lay jury cannot understand without an expert's help, and after all, under Rule 702, that's the test, whether or not organized crime may be engaged in gambling, but it's important to understand that in this case, Your Honor, they went far further than that because what Mr. Carrillo also said was that these crimes were essentially enterprises, using the term repeatedly enterprises some 10 times, which even more closely linked their commission to the government's theory of the case here. That's not proper either. Investigator Carrillo also went way outside the permissible bounds of expert testimony. I'm sorry, you say expert testimony can't be linked to the government's theory of the case? Sure, because as part of count three, the RICO conspiracy charge, what the government was required to show, among other things, was that the alleged racketeering acts were linked or were committed in furtherance of the charged enterprise, which was the Lucchese crime family. So now you have Carrillo, the so-called expert, explaining not only that they typically commit crimes, but then also showing that there's a link between those crimes and the enterprise itself. He went further, though. When asked about gambling in particular, he testified regarding Government Exhibit 405, which is reproduced at page 35 of our brief, Your Honors, and you may bookmaking operation, which put above the bookmaker, the organized crime member. Now, surely Mr. Carrillo didn't have to name Mr. Castelli. He didn't have to name the Lucchese family, but quite clearly the implication was there, namely that he was making clear to this jury that it was the Lucchese crime family and Mr. Castelli that was at the top of this chart. If the improper purpose of this testimony wasn't already crystal clear, here's what the government said on summation at page 720. You remember this chart, and meanwhile they're putting up the photos of these people onto the chart. Do you remember this chart? This is the chart that Special Agent Carrillo used to illustrate a typical bookmaking operation. This is exactly how it played out here. This is exactly how it played out here, and then he goes on, and on top is the defendant taking his cut, threatening people, and bossing them around, but not doing much else. So what the government successfully did was its expert testimony with its fact witnesses to support its theory of prosecution. Well, you don't disagree that an expert witness can testify to how organized crime or an organization like this might typically function, and then they can connect that to the fact witnesses. You just think here that the connection was too close? It's not that it's too close. It's just that they intentionally confused the expert testimony with a fact testimony, and this is precisely, by the way, what caused the reversal in United States v. Castillo, where what this court says was that the government's summation relied on expert testimony that drug dealers forced buyers at gunpoint to use drugs to conclude the defendant possessed a gun during the undercover buy, and for a similar reason, this court also reversed the conviction in Cruz. Mr. Levin, would you remind me of something? I should remember this, but you can remind me whether at that point with the photographs, whether that was objected to or whether that's here on plain error? No, that particular part of the testimony was not objected to. The court will recall that this issue concerning the expert generally was extensively discussed pre-trial, and the motion to exclude was denied, but no, Mr. McMahon didn't pop up and down every time. No, that's all I wanted to know. I was testing my memory, not yours. Thanks. Your memory is correct, Your Honor. Also, the government relied very heavily, or it seems like Mr. Carrillo relied, on hearsay testimony. Briefings of some 50 cooperating witnesses. He also sat in on the debriefing of some of the witnesses. I'll give you some time to get to the other point. I'm trying to figure out where we draw the line. If you have testimony about a pump and dump scheme, how pump and dump schemes work, an expert presumably is going to know that information because they have spoken to lots of people and they have investigated lots of pump and dump schemes. You're not suggesting that an show how the evidence reveals that this is a pump and dump scheme, are you? No, I'm not. I'm not, Your Honor, because a pump and dump, I believe, is a rather complicated price of security and dumping it in various ways. I don't think that the average person understands that. I do think that the average person understands, however, Your Honor, that organized crime may be involved in gambling or extortion. So you can't generalize in that manner. There are some things that the average juror can understand and some things that the average juror would not necessarily understand. Let's get now to your second point that you wanted to cover, which was the impeachment. Yes, thank you. So there were two avenues of of manslaughter when he killed his paramour after learning that she supposedly had been unfaithful. The second, though, Your Honor, was very directly related to this case because he knocked the teeth out of another girlfriend upon believing or coming to believe that she had slept with Mr. Castelli. It's one thing for defense attorney or the government to be able to elicit from this witness that, yes, he was very mad, but he had gotten over it and harbored no ill will, which is what his testimony was in this case. So it didn't really matter. And then it's another thing entirely for the jury to know that he was so angry at what the two had done, what Castelli and his girlfriend had done, that he knocked her teeth out. And a reasonable inference from that would have been since Panisi would knock his girlfriend's teeth out for sleeping with Mr. Castelli, goodness knows what he would be doing to Mr. Castelli. The court reasoned for excluding the cross. His anger at the lady is anger at the lady. She's not the witness. But that missed the point since the conduct, in fact, reflected the very depths of Panisi's hatred of Castelli and provided a specific motive. This is not general impeachment. This is a specific motive for him to lie. And it's important also to understand that Panisi's testimony. Well, the motive got in. The idea that he, whether he believed that there was, they had slept together and whether he was jealous about that, got in. You're saying the intensity of his feeling about it is what was excluded. Sure. Yes, it was the intensity of the feeling. And it was the fact which we believed was untrue, that he said, well, I was angry at the time, but I got over it. It's affecting me at this point in time. Well, the jury was entitled to assess the truthfulness of that statement against the fact that he was so angry at the time that he knocked his girlfriend's teeth out. And Panisi, remember, was a key witness in this case. He testified on direct over a period of some 80 pages, testified to conversations he had with Castelli regarding illegal conduct, including proposed drug dealing and also obtaining a no show job. And of course, just 30 seconds to discuss. There is no way, there's no way that this evidence supports the conclusion that Mr. Castelli acted with intent to defraud Del Sano contracting when he allegedly had a no show job. Del Sano wasn't even paying him. And Del Sano's contract with ACDM was a fixed fee contract. There's no evidence whatsoever that Mr. Castelli had any intention to harm him. In fact, the only piece of evidence, the only shred of evidence that the government cites in its brief at page 39 in support of an intent to defraud Del Sano is one email from a Del Sano employee to an ACDM employee asking to have a walkthrough on the job to resolve some outstanding issues. Had absolutely zero to do with Castelli. He had nothing to do with any of this. This is important, your honors, because if in fact the jurors did not find the racketeering extortion acts proved, which undoubtedly did not because Mr. Castelli was acquitted of extortion, that only leaves in support of the RICO, the three related gambling racketeering acts. But in order to prove the gambling racketeering acts, they had to do more than just prove the one. They had to prove that those gambling racketeering acts were comprised a pattern of racketeering activity and also that they were related to the Lucchese crime family, which were greatly debated during the trial. This court has said repeatedly, as the Fifth Circuit has said, that in such circumstances, the court should not second guess, should not second guess what the jury would have done. And therefore, your honor, we ask that a new trial be granted. Thank you. Okay. Thank you, Mr. Levitt. We'll now hear from Mr. Fiddleman. Thank you, your honor. May it please the court, Jacob Fiddleman for the United States. I represented the government at trial and on this appeal. I'll focus on the issues that Appellants Council focused on. First, the district court did not err in its evidentiary ruling admitting Special Agent Carrillo's expert testimony. To lay some groundwork, much of Castelli's argument is targeted towards the general unnecessary nature of expert testimony with respect to organized crime. But this court has said time and time again that expert law enforcement testimony about the mafia and its terminology, composition, structure, and practices is proper expert testimony. That's well established. What's also well established is that Special Agent Carrillo is qualified as such an expert and his testimony is properly admitted. This court has said that specifically as to Special Agent Carrillo several times, as have a number of district courts. And these two points were essentially the subject of Castelli's pretrial motion in limine. At issue now is whether specific portions of Special Agent Carrillo's testimony were improper because they exceeded the bounds. Can I ask you a question on that? The Special Agent acted as both an expert witness and a fact witness in this case. That's correct. I just was wondering, it may be perfectly all right, but aren't you courting trouble when you do that? I mean, is it necessary? You can't find another confusing, perhaps confusing, the judge and the jury as to when he or she is acting as an expert and when he or she is talking about this case. So, Your Honor, I don't believe that there's any risk of confusion, particularly given Judge Hellerstein's ruling as to how to handle that, which is to call Special Agent Carrillo twice, separated by one or more other witnesses. And Special Agent Carrillo's fact testimony was very limited. It was limited to submitting some surveillance photos that he had taken of general Lucchese crime family functions and identifying the people shown in those photos. So, in some way, his fact testimony was also actually quite limited. But with that division, there's nothing improper. Well, can you agree that if, in fact, what he had done was testify that this particular gambling operation was part of this particular criminal enterprise and that's how it all fits together, that would be improper because he's talking about facts, right? Well, what I would say is that that's certainly not what he did in this case. I think it probably depends on the facts and circumstances as to how far an expert can go. The Special Agent Carrillo's testimony was not close to the line in this case. What Your Honor is describing is similar to the facts in the Mejia case, which is where this court laid out most clearly the limits on this testimony. In the Mejia case, the expert witness testified to specific murders and specific travel across state lines. I guess what I'm just wondering is, isn't it possible that an expert witness, especially one who's involved in this particular investigation, might actually be testifying about the particular case, but as long as he states it in the language of a generality, that's what makes it okay? Well, that very well may be right, Your Honor. Here, though, Special Agent Carrillo clarified— It might be right that even if you're talking about the particular case, as long as you phrase in terms of a general practice, that's fine. That's all that's required. Provided, of course, that you're honestly testifying on opinions and expert knowledge that you've gained as an expert. If an individual takes the facts of the case and only on that basis provides an expert opinion about specialized knowledge, there may be complexities there. But in this case, Special Agent Carrillo has decades of experience, hundreds of investigations, thousands of surveillances, listening to wiretaps, debriefing informants, which, as Judge Sullivan noted, there's nothing improper about part of an expert's expertise being based on what other people have told him. And so Special Agent Carrillo's basis for knowledge was well-established here, and it wasn't just parroting hearsay. Is it a problem if it's hearsay about in this particular case that can't be admitted by a fact witness? Again, I think it would depend on whether it fell within the expert's general expertise and specific areas of knowledge to be able to opine on that question. Simply relaying a fact that a single confidential informant or cooperating witness had told the expert and then restating it to the jury without the expert actually adopting it and being able to offer it as an expert fact that he knows to be true could, in certain circumstances, be improper channeling of hearsay. But the expert rules are quite clear that hearsay can underlie an expert's general fact understanding. Special Agent Carrillo also made no error in testifying as to specific activities that the Mafia typically engages in. And in fact, for Special Agent Carrillo to have on other things that the Mafia engages in that had no relevance to the case would have been improper. So of course, the testimony that he offered about conduct of the Mafia related to the facts of this case. The defense counsel's objection here... Why would it have been improper? So if there's a question about how the Mafia generally makes its money and he thinks it's often from other sources and not gambling, wouldn't that be what he should have answered? I mean, what do you mean it had to be related to the case? I'll rephrase that. For the government to offer a whole body of testimony about crimes that are not in issue in the case could theoretically be improper. Certainly, it's not wrong for the witness to truthfully answer a question. But my point was, of course, the government is going to offer expert testimony that relates to the subject matter at issue in the trial. I'll just briefly address the summation point. The government summation is precisely what attorney argument at the end of a trial is for. The expert provided general testimony about how illegal gambling operations typically work and the specialized terminology and flow of money and other things involved in them. And then fact witnesses demonstrated Castelli's behavior and the behavior of the other co-conspirators in this case. And then the government was free to argue in summation that the general practices that had been articulated by the expert were, in fact, what happened in this case. So defense counsel is essentially arguing that the facts of the case were too accurate, too general compared to what the special agent Carrillo's testimony was. So there's nothing improper about evidence being corroborated or matching other pieces of evidence. That's not improper bolstering. Well, it seems like what you're saying is that to go back to my pump and dump example that that's what went on here. You seem to be of an illegal gambling operation are akin to a pump and dump operation that's beyond the knowledge of jurors and therefore is fair game for an expert. That's precisely right, your honor. And this court has so helped. I'll turn briefly to the question of just a moment. So I guess you said earlier that as long as they're testifying truthfully, even if they're talking about the particular case with phrasing it in generality, that might be okay. But I guess you can understand that there might be a case where they really are just talking about the particular case and all they're doing is changing the phrasing. And maybe we want some assurances that they're not gearing their expert testimony to be an end run about limitations on fact witnesses. So how would you be able to show that in a problematic case, but for the fact that like what, what, what would we look to to see when it's improper and when it's proper? Well, your honor, I think you would look to the experts stated basis for his expertise and for his testimony, which can certainly be raised in a, in a pretrial motion as it was in this case. And the judge can make a determination as to whether what the expert is offering to say is in fact based on specialized knowledge and expertise. I think the jury also had the ability to test the reliability of the experts statements against what the expert testified to as the basis of his opinions. So special agent Carrillo testified about the career underlying his knowledge in this case. And so I think there's no issue about not being sure when a problematic circumstance may be arising. But if, if the expert on pump and dumps derived all his knowledge from the particular case that's on trial, that investigation, you would agree that person wouldn't be qualified as an expert, right? That's right. Barring other facts. I think that's probably right. Okay. If I may, I know I see I'm over my time, but I'll briefly address the limits on cross-examination of the government's witness, John Panisi. So here, Judge Hellerstein did not abuse his discretion in concluding that the most probative components of these two matters should be admitted as the government conceded and excluded only the most when added marginally to what was permitted. So what was permitted was to ask Mr. Panisi 90, that he had testified at his trial and had committed perjury to protect himself and his co-defendant, and that he had been sentenced to a long prison term. And the only additional fact that the judge excluded was the nature of the conviction and that it was for manslaughter. And the judge properly concluded that there was little to no additional probative value with respect to credibility and that it risked inflaming the jury, confusing the issues, particularly given the, the nature of that underlying case. And in any event would be a, so the government submits that Judge Hellerstein got it exactly right with respect to that narrow limitation. With respect to the allegation, this question that opposing counsel said that what didn't get in was the intensity of his feeling about, about the betrayal. So that, that I think relates to the second and unrelated act, which is the alleged domestic violence, right? Because the manslaughter conviction was from 30 years earlier and did not relate to Castelli or the woman Castelli allegedly slept with in the more recent past. So with respect to those domestic violence allegations, I do take defense counsel's argument to be that it has to do with the intensity of his bias. But on that point, Castelli was allowed to elicit that there was a point at which Panisi believed Castelli had slept with Panisi's then girlfriend and how it made him feel both then and now, and whether that provided him with a motive to lie against Castelli. And this of course is against the broader backdrop of all of the other impeachment material that defense counsel raised in terms of the cooperation agreement and Panisi's motives or lack thereof to lie for other reasons. And, and here again, Judge Hellerstein acted well within his discretion in concluding that the marginal additional point of an alleged act of violence against Panisi's intimate partner added little to no additional relevance beyond the testimony that was already elicited. He didn't quite articulate it that way, did he? Well, I think, I think he did. I think when he said the anger against the woman is anger against the woman, what he was saying is you cannot necessarily infer that an individual who believes he's been cheated on being angry at his intimate partner translates to equivalent or more intense anger at the person who slept with his intimate partner. Those are, those are two different things. And on top of that, you have the clearly inflammatory nature of the allegations. Defense counsel's heavy emphasis in the brief and in argument of knocking this woman's teeth out underscores the inflammatory nature of the testimony. So Judge Hellerstein did not err in excluding that, that allegation of domestic violence. And, and again, that is a conclusion that this court and others routinely uphold with respect to the prejudicial nature of domestic violence allegations. So unless the court has any further questions, we'll rest on our written submission. All right, now let's, let's stop there. We're already five minutes over. So Mr. Levitt, you've reserved two minutes for rebuttal. Yes, thank you, your honors. I, I know the history of expert testimony in these kinds of cases in this court shows that we had a reversal in 1988 in United States versus SCOP, a reversal in Castillo in 1991, reversal in Cruz in 1992, and a reversal in Mejia in 2008. But I think it's, it's, it's really time that, that the court... We're due? Is that what you're saying? We're due for what? I would like to think so, your honors. And, and I think that, that probably it would be a good thing for the government to have clarity. I think there is clarity, but apparently it needs to be reinforced with regard to this. Just very briefly, what, what this court said in Mejia was it is a little too convenient that the government has found an individual who is expert on precisely those facts that the government must prove to secure a guilty verdict, even more so when that expert happens to be one of the government's own investigators. Carrillo, of course, was one of the government's investigators. And the fact concerned the typical commission by organized crime of the very specific crimes with which Mr. Castelli was charged. And then in Cruz, this court said, we reaffirmed here the principle that the credibility of a fact witness may not be bolstered by arguing that the witness's version of events is consistent with an expert's description of patterns of criminal act, of criminal conduct. That's precisely what happened when the government filled in the blanks in the, in the chart, in, in, in, in, in GX405 with Mr. Castelli's photo. And, and this court also said in, in Cruz that the prosecutor was thus able to argue that the expert's testimony about how drug operations are run in this particular area is precisely what the fact witnesses described that defendant was doing. So over and over again, this court has said that the government through its experts may not do precisely what the government did in this particular area. Thank you, Mr. Levitt. Thank you, Mr. Fiddleman. We will reserve decision, but we'll argue we got our money's worth out of you. So have a great day. We'll